UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

V.

ANGEL CHEVERE GONZALEZ,

    Defendant

CRIM. NO. 97-245
CIVIL NO. 04-2589 (PG)

### AFFIDAVIT OF ANGEL C. GONZALEZ

I, Angel Chevere Gonzalez, do hereby despose and say:

1. I am the defendant in the above captioned case. I also am capable of making the assertions in this affidavit, intelligently and voluntarily and, to testify to the facts contained herein.

2. I was arrested by Federal officers on November 4, 1997. After my arrest, the District Court appointed Attorney Juan Matos De Juan to represent me in the criminal proceedings. It is my understanding after trial that this was Mr. De Juan's first criminal case ever being tried before a jury, as a Federal Public Defender.

3. During the same month, on or about November 11, 1997, I was transported to court and charged with conspiracy. Again, De Juan represented me at this stage of the proceeding's. However, after appearing in court, De Juan told me that he would come out to the detention center and visit me to discuss and explain the accusations of a conspiracy against me- as well as - what evidence the government had against me.

4. Upon De Juan's first visit after appearing in court with me, the date I cannot quite remember, De Juan never provided me nor informed me of the evidence against me, or provided any documents in reference to my case. Mr. De Juan's conversation was centered around what the Assistant U.S. Attorney had told him to tell me, which was, "whether

                                              **Exhibit A**

Page Two

I was interested in cooperating with the Government'; I answered "what do you want me to cooperate about? I don't even know what I am being charged of and with whom.

5. Throughout the early stages of my case, de Juan's representation of me was questionable. I requested copies of any discoverable information against me in order to aid De Juan in proving my innocence, and evidence from another case which he was also assigned, Carlos Naranjo. De Juan would spurn my request by stating that "I should not worry about it because it was a trifling matter and, the Naranjo case would be dismised or I'd be given time served."

6. After several more weeks elapsed, De Juan visited me again. This time, he mentioned he had the audio tapes pertaining to the Raul Rivera Perez case. . . and it would take him awhile to review them. . . but, however, me and him (De Juan) would listen to them together. Regardless of this statement from De Juan, arrangements were never made for us to listen to the tapes to ensure that that was my voice being heard.

7. Upon meeting De Juan on another visit, he would always tell me that he would give me the discovery against me later, but the thing I could do for myself would be to cooperate with the government because of my criminal record. . . and be an informer to jeopardize my life and the safety of my family.

8. Because I spurned De Juan's offer to cooperate with the Government and become an informant, my relationship with De Juan, if any, began to deteriorate, as well as, my rejection of de Juan's demands for $25,000.00 payment to do more on my case.

9. Moreover, De Juan would always make mention of my finacee, calling

Page Three

her (as if he were concerned with my interest) under the pretenses of having her and him (De Juan) listen to the audio tapes. I would tell De Juan "that it was not her who should or needed listening to the audio tapes but me." Nevertheless, De Juan would always bring up the subject of my wife. . . and his insistence upon speaking to her to explain my case. . . eventhough I knew that he was captivated by her beauty.

10. On many occasions when De Juan visited me, it was only for brief periods. It would always be the same story or problems. . . he was always in a hurry and would call multiple clients down to the visiting room with me--only to say that he would see us all later because he didn't have time. Little did we all know that De Juan never tried a case before in his life and lacked experience in such a complex conpiracy case as mines.

11. Furthermore, during the early stages of my case, and well before trial, I had informed De Juan that I was an employee for Raul R. Perez's business and, my only affiliation with his business was legitimate and professional. I was hired by Raul as a mechanic. Additionally, at the of this conspiracy, I was no where near the location where Orasco described having allegedly seen me during a 250 kilogram cocaine deal. . . in July 1997. De Juan never attempted to investigate my claims of being actually innocent of these charges.

12. Preceding another occasion and visit from de Juan and while in detention, "I informed De Juan that he had a client in Unit (David Santiago) who needed to speak with him." Attorney Matos told me "what he has to do is cooperate" because, he didn't have time for that case

and he was a pessimist." I told him (De Juan) "he should be the complete opposite, since there were many accused people who were innocent" and not always guilty of what they were accused of. I told him also "that he should be a bit more optimistic, and he replied, "I will think about it.""

13. In the time that transpired just before my trial date, I really learned that De Juan was a pessimist with a profound negative attitude --according to his own words. So, I sought a meeting with him to let him know that I did not feel comfortable with him representing me during my trial and, I wanted him to motion the court to withdraw himself from my case because of multiple conflicts of interests. De Juan immediately told me that was no problem because, he "was not prepared either for trying my case."

14. Despite De Juan's lack of preparation, investigation and interest, De Juan scheduled a hearing date in court to bring to the court's attention of my dissatisfaction of him, but, however, said the complete opposite of what he had told me to the district judge, . , . that was, "I was highly satisfied with his performances. De Juan, nonetheless, told me that "it was not in his best interest as an attorney to remove himself even if he was too busy with other matters." Furthermore, De Juan also made it quite clear that "he had never been in a trial before by a jury", and, therefore, mines was his first trial case.

15. Moreover, and recently, I had a conversation with my sister, Tomasa Gonzalez, in March 2005. She revealed to me that she had overheard a conversation while in the women restroom in September or November 1999, between two women whom she later found out were the prosecuting attorneys

Page Five

in my case. Tomasa stated to me that "both ladies were laughing with each other and speaking on how they had set me up with the other codefendants in the conspiracy case; that they mentioned that they did not have any real evidence on me, only circumstancial evidence. . . despite knowing I was innocent of wrongdoings with others charged in this case. Tomasa then existed the restroom and proceeded back to the courtroom to witness my trial. At that time, she stated that "she immediately recognized the two women laughing and discussing my being set-up by the Government...as prosecuting Attorneys Rosa Emilia Rodriguez and Desiree La Borde."

16. I questioned her as to why she never brought this matter to my attention and the Court, or De Juan. Tomasa stated that "she was afraid, because, if the Government would go as far as to set her brother up for a crime which he never was involved in, then imagine what the Government would have done to her to quiet her."

17. Ms Tomasa Gonzalez has demonstrated her willingness to testify to these facts and information when called upon by the Court.

Dated: 3/22/05                    _Angel Chevere Gonzalez_
                                   Angel C. Gonzalez

VERIFICATION

I, Angel Chevere Gonzalez, here verify under the penalty of perjury that the information herein is true and correct. 28 U.S.C.A. § 1746.

                                   _Angel Chevere Gonzalez_
                                   Signature of Affiant